# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

FRANCIS LAI,

        Petitioner,

v.                                                            Case No. 3:20-cv-551-TJC-MCR

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

        Respondents.

_____

## **ORDER**

I.   **Status**

Petitioner, Francis Lai, an inmate of the Florida penal system, initiated this action by filing a pro se Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody. Doc. 1. He also filed a memorandum supporting the Petition. Doc. 2. He challenges a state court (Duval County, Florida) judgment of conviction for first degree murder and burglary of a dwelling. He is serving a life term of incarceration. Respondents filed a

Response. <u>See</u> Doc. 7 (Resp.).[1] Petitioner filed a Reply. <u>See</u> Doc. 10. This case is ripe for review.[2]

## II.   **Governing Legal Principles**

### A. Standard Under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. <u>See</u> <u>Ledford v. Warden, Ga. Diagnostic & Classification Prison</u>, 818 F.3d 600, 642 (11th Cir. 2016), <u>cert.</u> <u>denied</u>, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" <u>Id.</u> (quoting <u>Greene v. Fisher</u>, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. <u>See</u>

---

[1] Attached to the Response are several exhibits. The Court cites the exhibits as "Resp. Ex."

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." <u>Jones v. Sec'y, Fla. Dep't of Corr.</u>, 834 F.3d 1299, 1318 (11th Cir. 2016) (citing <u>Chavez v. Sec'y Fla. Dep't of Corr.</u>, 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Id.</u> The Court finds that "further factual development" is unnecessary. <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

<u>Marshall v. Sec'y Fla. Dep't of Corr.</u>, 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. <u>See</u> <u>Harrington v. Richter</u>, 562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

<u>Wilson v. Sellers</u>, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." <u>Id.</u> § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." <u>Renico v. Lett</u>, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Id.</u> [at 102] (citing <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. <u>See, e.g.</u>, <u>Mitchell v. Esparza</u>, 540 U.S. 12, 18 (2003); <u>Lockyer</u>, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); <u>Williams v. Taylor</u>, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

<u>Bishop v. Warden, GDCP</u>, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

## III.   <u>Procedural History and Facts</u>

In June 2013, the state charged Petitioner and co-defendant Mackenley Fiacre with the first degree murder and armed burglary of Barnat Bella. Resp. Ex. 2 at 6. Petitioner and Fiacre had a joint jury trial, each represented by separate counsel. During opening statements, Kevin Carlisle, Petitioner's trial counsel, argued that Petitioner and the victim were friends; and on the night of

the incident, Petitioner was at the victim's home when an unknown armed individual broke in through the bathroom window and robbed the victim at gunpoint before shooting the victim and killing him. Resp. Ex. 50 at 363-64. According to counsel, during the burglary, Petitioner fled the scene by diving through the glass of a bedroom window, cutting his arm in the process. Id. at 364-65. Counsel argued that after the gunman left, Petitioner reentered the victim's home to check on his friend and look for the victim's gun. Id. at 366. As Petitioner searched the home, the cut on his arm dripped blood throughout the crime scene. Id. Counsel asserted that Petitioner then left the scene without calling police because, as a native of Sudan, he did not speak English well and feared police would assume he participated in the burglary and murder. Id. at 366. Petitioner then went home to his then girlfriend, Kiristina Jok, and told her what happened at the victim's home. Id. But, according to trial counsel, when Jok later discovered Petitioner was cheating on her with another woman, Jok lied to police and told them Petitioner confessed to committing the crimes. Id. at 366-68.

Officer Latoyle Tuten testified at trial that on April 12, 2013, around 9:03 p.m., she responded to a 911 dispatch regarding an activated security alarm at 2417 Ms. Muffet Lane, the home of Barnat Bella. Resp. Ex. 51 at 395. When she arrived, she noticed that one of the home's windows had been "blown out." Id. Officer Souters arrived as backup and Tuten and Souters walked the perimeter

of the house and noticed the front door was secure with locked burglar bars. Id. at 396. Souters then noticed there was a second busted out window in the rear bathroom of the house. Id. at 397. Tuten contacted a neighbor who gave the officers the victim's phone number and when Tuten called the number, the officers heard the cell phone ringing from inside the victim's home. Id. at 398. Tuten phoned her supervisor and obtained permission to enter the home and check on the victim. Id. at 399. The fire department arrived with breaching tools to pry the burglar bars from the front door, so officers could enter, and upon entry, they found the victim's body lying on the floor in a pool of blood with shell casings nearby. Id. at 403. Tuten and Souters then secured the rest of the house, during which Souters used a battering ram to open a locked interior door. Id. at 404-05. They noticed that the home appeared ransacked and even the mattress and box spring had been thrown from the bed. Id. at 405.

Detective Andrew Kipple testified that he was the lead homicide detective on this case. Id. at 412-13. Kipple stated that when he arrived at the scene, he saw the broken windows and determined that the rear bathroom window was broken from the outside, indicating a point of entry, and the bedroom window was broken through the inside, indicating a point of exit. Resp. Ex. 52 at 418-19. Kipple also found .40-caliber shell casings throughout the house, including two shell casings in the hallway where the victim was found and one casing in the master bedroom. Id. at 422-23; Resp. Ex. 54 at 500. According to Kipple,

shards of glass from the broken bathroom window and the bathtub were dusted for fingerprints. Resp. Ex. 52 at 424-31. Kipple and another Detective, Sean Kobylarz, also took DNA blood samples from areas next to the victim's body, the hallway, the mattress, and the broken glass from the bedroom window. Id. at 433-42. A nylon gun case was found in the victim's bedroom, but no gun was in the case or anywhere else in the home. Id. at 465-66.

Kobylarz also testified at trial. Resp. Ex. 57. Kobylarz acknowledged that during his pretrial deposition, he testified that he was the individual who swabbed the blood from a shard of glass, but after his deposition, he spoke with Kipple who reminded Kobylarz that Kobylarz actually held the glass while Kipple swabbed it for DNA. Id. at 590-92. During cross-examination, James Boyle, trial counsel for the co-defendant, highlighted these discrepancies in Kobylarz's deposition testimony and trial testimony. Id. at 600-09.

Dr. Jesse Giles, the medical examiner who conducted the autopsy of the victim, testified that the victim died from a single gunshot wound to the back of his neck, with an exit wound through the front of his neck. Resp. Ex. 62 at 753. According to Dr. Giles, discoloration and soot around the entrance wound indicated that when the shot was fired, the firearm was "almost touching the skin," describing it as "a near contact wound." Id. at 760.

Maysaa Farhat, a Florida Department of Law Enforcement crime scene analyst, testified that he examined the shell casings recovered from the scene.

Resp. Ex. 59 at 680. During his examination, he determined that the shell casings recovered from the victim's home were discharged from the same firearm used in a prior unrelated crime that occurred in January 2013. Resp. Ex. 60 at 689. According to Farhat, when testing firearm-related evidence, it is common to learn that the same firearm has been used in multiple, unrelated crimes because possession of a single firearm often changes from one person to another. Id. at 697-98. Nicole Lee, another FDLE lab analyst, testified that she conducted the DNA testing of the evidence collected at the scene and when she entered the DNA profiles from the samples taken from the bedroom and broken glass into CODIS, CODIS generated a DNA match for both Petitioner and co-defendant Fiacre. Resp. Ex. 60 at 719-20. Lee gave that DNA information to Detective Cullen who then obtained cheek swabs from Petitioner and Fiacre to make further comparisons. Id. at 721. After creating a full DNA profile for Petitioner, Lee tested the blood samples from the hallway, which matched Petitioner's DNA. Id. at 724, 726. According to Lee, the major DNA profile taken from the blood in the bedroom also matched Petitioner. Id. at 726-27. And the complete DNA profile taken from the blood on the shard of glass matched co-defendant Fiacre. Id. at 727.

Kiristina Jok testified that when the murder occurred, she was dating Petitioner. Resp. Ex. 59 at 644. While they were dating, Petitioner introduced her to his friend Fiacre. Id. at 645. On the night of the murder, Jok was at

Petitioner's house when she received a phone call from Fiacre. Id. at 648. According to Jok, at the time of the murder, Petitioner did not have a cellphone, so his friends would call her phone to reach Petitioner. Id. When Fiacre called that night, Jok handed the phone to Petitioner who spoke with Fiacre. Id. at 649. Jok testified that she then left and went to the store, and when she returned to Petitioner's house, Petitioner was gone. Id. at 649-50. Jok stated Petitioner was gone for "a couple of hours." Id. at 650. According to Jok, when Petitioner returned, he appeared upset and had a cut on his forearm. Id. Jok asked Petitioner multiple times why he was upset, but Petitioner refused to give her an answer until the next morning. Id. at 650-53. Jok explained that Petitioner told her "[he] and some other guy broke into a house and the other guy fought Bella and the other guy shot Bella and then they got out." Id. at 653. Jok clarified that when Petitioner told her this, he did not use Bella's name, but she saw the murder on television and inferred that Bella was the individual Petitioner was referring to. Id. at 654. Jok stated Petitioner also told her he cut his arm on the window during the incident. Id. at 654. Jok testified the cut was about two inches long and deep enough to see flesh. Id. at 667.

A week after Petitioner confessed to Jok, she broke up with him because the crime "was too much"; however, they remained friends. Id. at 655. Jok also testified that at that time, she was friends with Patricia Masters who shares a daughter with Petitioner, and Patricia Masters's mother, Jennifer Masters. Id.

9

at 655-57. According to Jok, she and Petitioner were at Jennifer Masters's home on the morning Petitioner was arrested for the crimes, and on the day he was arrested, Jok told police about Petitioner's confession. Id. at 657. Jok explained that she told police about Petitioner's confession because she believed if she told police that another individual shot the victim, that information would reduce Petitioner's culpability. Id. at 661. Jok denied that Petitioner cheated on her while they were a couple and she denied telling Petitioner's mother that she lied to police about Petitioner's participation in the crime. Id. at 664, 667-68.

After obtaining a DNA match, an arrest warrant was also issued for co-defendant Fiacre. Resp. Ex. 63 at 787-88. Officer Walter Cullen arrested Fiacre at his mother's home and took him to the police station for questioning. Id. at 788. The interview was videotaped, and Cullen advised Fiacre of his rights before asking questions. Id. at 790. Portions of the recorded interview were played for the jury. Id. at 796-809; Resp. Ex. 64 at 810-31. Fiacre told Cullen he had never been inside the victim's home, he did not know Petitioner, and he denied participating in the murder. Resp. Ex. 64 at 826-31. Cullen also testified that he was the officer who arrested Petitioner at Jennifer Masters's house. Id. at 833. According to Cullen, Jok was present when he arrested Petitioner and she advised Cullen about Petitioner's involvement in the murder of the victim and told Cullen that the person Petitioner "did this with came and picked" him up beforehand. Id. at 836-39. Cullen explained that he did not collect Jok's cell

phone as evidence because Jok did not tell Cullen that Fiacre called the night of the murder. Resp. Ex. 65 at 876. Cullen also stated that to his knowledge, officers never recovered the firearm used in the unrelated January 2013 crime or the April murder of the victim. Id. at 854.

After the state rested its case, Fiacre called Detective Swanson who investigated the January 2013 unrelated shooting involving the same gun as that used in the victim's murder. Resp. Ex. 68 at 947-53. Swanson testified that Devonte Lewis was arrested and charged with the January 2013 shooting and after the April 2013 murder of the victim, he conducted a further investigation and determined there was no evidence that the individuals involved in the January shooting participated in the April 2013 murder. Id. at 959.

Petitioner did not testify at trial. He called Jennifer Masters as a defense witness who testified that Petitioner is her grandson's father. Id. at 964. According to Masters, in April 2013, Petitioner was living with Masters and when Masters asked him for rent that month, he told her he "couldn't give it to [her] because he was attacked and robbed." Id. at 967. Masters explained that when Petitioner was arrested, she forgot Petitioner told her he was robbed. Id. at 968. She acknowledged that during the three years between Petitioner's arrest and trial, she spoke to the prosecutor multiple times, but around 12:30 p.m. on the first day of Petitioner's trial, she remembered and advised the prosecutor for the first time that Petitioner told her he had been robbed in April

2013. Id. at 969. Petitioner also called Atak Tong, a family friend, who testified that he attended one of Petitioner's pretrial hearings and overheard Jok's mother asking Jok why she was lying about Petitioner's involvement, and Jok responded that she was lying because she feared the police. Resp. Ex. 69 at 991-93.

The jury ultimately found Petitioner and Fiacre guilty of first degree murder and armed burglary. Resp. Ex. 76 at 1206-07. The trial court sentenced Petitioner to a life term of incarceration as to each count. Resp. Ex. 35 at 253. Petitioner, with help from appellate counsel, sought a direct appeal. Resp. Ex. 80. The First District Court of Appeal issued a written opinion affirming Petitioner's convictions and sentences and remanding for the trial court to correct a scrivener error in Petitioner's written judgment and sentence to reflect that Petitioner was convicted after a jury trial rather than a guilty plea. Resp. Ex. 83; see also Lai v State, 251 So. 3d 333 (Fla. 1st DCA 2018).

## IV.   **Analysis**

### A. Ground One

Petitioner asserts that the trial court erred in denying his request for a curative instruction and mistrial after the prosecutor, during closing arguments, commented that police officers, the government, and state attorneys "really don't lie." Doc. 1 at 9. According to Petitioner, this comment improperly

bolstered the state witnesses' credibility and materially contributed to the verdict. Doc. 2 at 4.

Petitioner, through appellate counsel, raised this issue on direct appeal. Resp. Ex. 80 at 29-35. The state filed an answer brief, Resp. Ex. 81 at 11; and the First DCA issued a written opinion addressing this issue before affirming Petitioner's judgment and sentences:

> In his first issue, Lai contends the trial court erred when it refused to give a curative instruction and denied his motion for a mistrial after he successfully objected to an improper comment made during closing argument. During the course of trial, counsel for both defendants implicitly or explicitly suggested that the police were untruthful, the prosecutor pressured witnesses to testify in the State's favor, and the police and prosecutor may have concealed evidence. During the State's rebuttal closing, the prosecutor attempted to refute those allegations by referencing the evidence and explaining his actions. However, the prosecutor went further, stating,

> > I'm hoping that maybe by what you saw with Jennifer Masters and how that whole scenario went down, you might see that cops and the government and the State Attorneys we really don't lie. You saw what happened—.

> At that point, counsel for both defendants objected. The trial court sustained the objection in front of the jury, but after a sidebar conference, the court declined to give a curative instruction and denied the defendants' motions for mistrial.

> [Petitioner] argues the comment that "cops and the government and the State Attorneys we really don't

lie" improperly bolstered the government witnesses' testimony by suggesting that government and law enforcement officials are inherently truthful or credible. The State counters that the comment was invited by defense counsel's suggestion that the prosecutor and police were pressuring witnesses, lying, and concealing, tampering with, or planting evidence.

We review a trial court's ruling on a motion for mistrial based on improper prosecutorial comments for an abuse of discretion. Salazar v. State, 991 So. 2d 364, 371 (Fla. 2008). A trial court abuses its discretion when no reasonable person would take the view adopted by the trial court. Id. at 372. "In order for the prosecutor's comments to merit a new trial, the comments must either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise." Id. (quoting Spencer v. State, 645 So. 2d 377, 383 (Fla. 1994)).

At the outset, we conclude that the prosecutor's statement constituted improper bolstering. A prosecutor may not bolster a witness's testimony by implying that one's position as a law enforcement official makes that witness more credible or less likely to lie. See, e.g., Johnson v. State, 177 So. 3d 1005, 1008 (Fla. 1st DCA 2015); Williams v. State, 747 So. 2d 474, 475 (Fla. 5th DCA 1999). We reject the State's assertion that the comment was justified as an invited response. While the prosecutor could have pointed to facts in evidence to suggest that the officers in the case were credible or that he was not pressuring witnesses to testify, he could not suggest that State Attorneys, police officers, or other government officials do not lie based on the nature of their positions. Cf. Payne v. State, 233 So. 3d 512, 515 (Fla. 1st DCA 2017) (noting that it was improper to suggest that a deputy should be believed because he is a sworn law enforcement officer

in response to defense attacking deputy's credibility). Thus, the trial court properly sustained the objection.

However, the trial court's denial of the motion for mistrial was not an abuse of discretion. The improper comment was an isolated one. Cf. Jenkins v. State, 96 So. 3d 1110, 1113-14 (Fla. 1st DCA 2012) (finding prosecutor's comment, although improper, was isolated and not grounds for a mistrial). Further, the context in which the comment was made reveals that the prosecutor was pointing to specific evidence in the record to demonstrate that neither he nor the police were lying or concealing evidence. Finally, the comment did not materially contribute to the verdict given the evidence against [Petitioner]. Jok testified that Fiacre called [Petitioner] the night of the murder and [Petitioner] left. When he returned, he had a cut on his arm. The next day, he admitted taking part in a burglary during which his co-perpetrator shot someone. [Petitioner] did not contest the facts that his blood was in the house or that he cut himself from glass from one of the broken windows. His theory of defense – unsubstantiated by any direct evidence – was that he was an invited guest of Bella's that evening but he ran away and jumped out the bedroom window when the real perpetrator showed up and began firing.[FN2] This was not a case that rested solely on circumstantial evidence or competing witness accounts. Cf. Williams v. State, 673 So. 2d 974 (Fla. 1st DCA 1996) (reversing conviction where prosecutor suggested officers would not lie where whole case was based on whether defendant or police officers were more credible). We conclude that the isolated comment, made in response to defense suggestions of impropriety, did not vitiate the entire trial and render it unfair.

[FN2] [Petitioner] allegedly then climbed back in through a window to check on Bella, which is how his blood ended up in the apartment. The presence of Fiacre's blood was not explained.

Resp. Ex. 83 at 3-5. The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications.[3]

In doing so, as the reviewing Court, it must evaluate an allegedly improper comment in the context of both the prosecutor's entire closing argument and the trial as a whole, because "[c]laims of prosecutorial misconduct are fact-specific inquiries which must be conducted against the backdrop of the entire record." United States v. Hall, 47 F.3d 1091, 1098 (11th Cir. 1995); accord United States v. Young, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by doing so can it be determined whether the prosecutor's conduct affected the fairness of the trial."). An improper prosecutorial remark compels habeas corpus relief only if the remark is so egregious that the proceeding is rendered fundamentally unfair. "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181

---

[3] In his initial brief on direct appeal, Petitioner raised this claim in terms of state law only and did not reference a due process violation or any other federal constitutional right. See generally Resp. Ex. 80. Respondents, however, do not argue that Petitioner failed to exhaust the federal nature of this claim and instead argue the Court should apply deference to the First DCA's adjudication as it "undertook the same analysis as that set forth in federal law," and its decision was not an unreasonable determination of the facts in light of the evidence before it. Resp. at 25-26. Considering the Response, and for purposes of this Order, the Court finds this claim exhausted.

(1986) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974)); <u>see also</u> <u>Tucker v. Kemp</u>, 802 F.2d 1293, 1296 (11th Cir. 1986) ("If a reviewing court is confident that, absent the improper remarks, the jury's decision would have been no different, the proceeding cannot be said to have been fundamentally unfair."). Due process is denied "when there is a reasonable probability," or "a probability sufficient to undermine confidence in the outcome," that, but for the improper remarks, "the outcome of the proceeding would have been different." <u>United States v. Eyster</u>, 948 F.2d 1196, 1206-07 (11th Cir. 1991). The prosecutor's comments must both (1) be improper and (2) "prejudicially affect the substantial rights of the defendant." <u>United States v. Thompson</u>, 422 F.3d 1285, 1297 (11th Cir. 2005). A prosecutor's comments constitute improper "vouching" if they are "based on the government's reputation or allude to evidence not formally before the jury." <u>Eyster</u>, 948 F.2d at 1206. Although improper vouching is grounds for reversal, it may be cured if the remarks are not "substantially prejudicial." <u>United States v. Sarmiento</u>, 744 F.2d 755, 762-65 (11th Cir. 1984).

Here, in his initial closing, the prosecutor attempted to discredit Petitioner's defense theory and Jennifer Masters's testimony by noting that direct DNA evidence proved Petitioner broke into the victim's home on the night of the murder. Resp. Ex. 72 at 1075-76. The prosecutor also commented on the principal theory and noted that the co-defendant's DNA was also found at the

crime scene even though during his police interview, Fiacre denied knowing the victim or Petitioner and denied being in the victim's home. Id. at 1077-78. During Petitioner's closing argument, trial counsel attacked Jok's credibility, implying she was a "jilted girlfriend" who wanted to get Petitioner in trouble and that she lied about Fiacre calling her the night of the murder. Id. at 1090; Resp. Ex. 73 at 1108. Trial counsel also argued that the prosecutor attempted to elicit testimony that only fit the state's version of events, an argument for which the prosecutor claimed was an improper insinuation that the state hid evidence. Resp. Ex. 72 at 1092. Trial counsel also attacked the state's version of events as being "just not true" and noted that the state decided, in the eleventh hour, not to call Jennifer Masters as a witness because the state did not want the jury to hear the truth. Resp. Ex. 73 at 1102, 1109. Counsel also argued that other state witnesses changed their testimony at trial, including Kipple and Kobylarz who could not recall who conducted the DNA swabs when collecting evidence. Id. at 1110. During co-defendant Fiacre's closing, his trial counsel also argued that the state witnesses were lying and that the officers "tampered with or planted" evidence implicating Fiacre. Resp. Ex. 74 at 1141.

In his rebuttal, the prosecutor responded to both defense counsels' suggestion that the state mishandled evidence by noting he immediately informed defense counsel when he learned that Jennifer Masters suddenly remembered relevant information about Petitioner. And while making that

point, the prosecutor made the improper comment that "cops and the government and the State Attorneys [] really don't lie." <u>Id.</u> at 1158. While this statement may have been an inappropriate attempt to bolster or vouch for state witnesses, in context, it was an isolated comment trying to show the state never concealed evidence. Further, considering the direct evidence implicating Petitioner in the crime, Petitioner cannot not show that but for the prosecutor's comment, the outcome of his case would have been different. To that end, Petitioner has failed to show that the prosecutor's improper comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

Upon review of the record and considering the closing arguments and the trial evidence, the Court finds that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Ground One is denied.

**B. Ground Two**

Petitioner argues that the trial court erred in denying trial counsel's motion for a mistrial after the state, during closing arguments, improperly commented on Petitioner's right to remain silent. Doc. 1 at 11.

Petitioner, with help from appellate counsel, raised this issue on direct appeal. Resp. Ex. 80 at 42-44. The state filed an answer brief addressing this claim on the merits and arguing the statement was an invited response to trial counsel's closing argument. Resp. Ex. 81 at 19-21. In support of that argument, it asserted:

> In this case the State's comment was an invited response to defense counsel's closing argument. Not only was the comment not improper, but it certainly did not vitiate the entire trial. During Appellant's opening statement, defense counsel stated that their defense was that Appellant was lawfully present in the victim's home when the window was broken and a gunman entered. Defense counsel stated that the Appellant dove through a window, which cut his arm and left his blood in the house, and then he reentered the house to check on the victim and found him dead. The only evidence that would support this theory would have to come from Appellant directly, and Appellant did not testify during the trial. No evidence was introduced that supported this theory.
>
> During Appellant's closing argument, defense counsel spoke at length about the defense theory that Appellant had been in the house lawfully, and fled through a window when the shooter arrived. The State eventually objected to this argument saying:
>
> > **Defense**: Now. You're probably asking yourselves why, if what I'm saying is true, would Mr. Lai not stay and speak to the police. Mr. Lai is from Sudan. He doesn't speak good English. He would be waiting in a house –

**State**: Objection, Your Honor. Counsel testifying. His client never took the stand, so these are facts not in evidence.

**Court**: Sustained.

**Defense**: He would be waiting in a house with an alarm going off, two broken windows, a two-inch gash on his arm – Your Honor, may we approach?

**Court**: You may.

**Defense**: Judge, in his objection, he commented on my client's right to remain silent. I have to move for a mistrial.

**State**: Your Honor, I objected because he's testifying about his client and things only his client could testify to and they are facts not in evidence. It is invited. I could actually get up and rebut it and comment on it.

**Defense**: Absolutely –

**State**: Judge –

**Court**: One at a time.

**State**: -- only other thing I would say at this time is I made an objection, I believe it is a proper objection and it is not grounds for mistrial based on what Mr. Carlisle had actually been testifying from opening statement until I finally objected right here. I don't believe that I have done anything that raises to the level of a mistrial.

> The trial judge denied the request for mistrial. The trial judge's denial was appropriate because the comment by the State was invited by defense counsel's closing argument . . . .
>
> . . . .
>
> Overall, the comment by the ASA was brief, and was a minor portion of the rebuttal closing argument. The comment was not so prejudicial as to vitiate the entire trial. Because the prosecutor's comment was justified, the trial judge did not err in denying the motion for mistrial. The trial court's ruling should be affirmed.

Resp. Ex. 81 at 19-23 (record citations omitted). The First DCA per curiam affirmed Petitioner's judgment and sentence through a written opinion, but it did not discuss this issue in its written opinion. Resp. Ex. 83.

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications.[4] In doing so, the Court has reviewed the parties' opening and closing arguments, Resp. Exs. 72, 73, 74; defense counsel's motion for new trial, Resp. Ex. 34 at 248-49; the trial court's hearing on the motion for new trial, Resp. Exs. 37, 38; and the briefs on direct appeal, Resp. Exs. 80, 81, 82, 83. Throughout trial, Petitioner's defense

---

[4] Again, in his initial brief on direct appeal, Petitioner only argued this claim in terms of state law, citing no federal constitutional provision or otherwise arguing a due process violation. See generally Resp. Ex. 80. Respondents do not expressly argue that the federal nature of this claim is unexhausted and instead ask the Court to defer to the First DCA's adjudication of the issue because it was not an unreasonable determination of the facts in light of the evidence before the state court. Resp. at 29-32. Thus, for purposes of this Order, and for judicial efficiency, the Court considers this claim to be exhausted.

was that he was visiting the victim when another, unknown individual broke in and killed the victim. Petitioner argued he did not call police after the incident because he did not speak English well. Petitioner, through trial counsel, was arguing that point when the state made the objection about "facts not in evidence" and noted Petitioner "never took the stand." Resp. Ex. 73 at 1102. While this may have been an inappropriate comment on Petitioner's right to remain silent, any error was not so prejudicial as to make the resulting conviction a denial of due process. Indeed, the state's comment was isolated, and the record contains ample direct evidence supporting the jury's verdict. Thus, upon review of the record, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Ground Two is denied.

### C. Ground Three

Petitioner argues that the trial court erred in finding that defense counsel's race-neutral reason for requesting to use a peremptory strike on juror 52 was pretextual. Doc. 1 at 13.

To add context, the Court summarizes the relevant facts. After engaging in a lengthy questioning of the jury panel and before discussing cause challenges, a court bailiff advised the trial court that juror 6 approached the

bailiff and expressed her concern about potential retaliation against the jurors if the trial resulted in guilty verdicts. Resp. Ex. 45 at 212. The trial court then conducted individual questioning of juror 6 and any others jurors who may have discussed the concern. Id. at 212-29; Resp. Ex. 46 at 230-35. After individual questioning, counsel for co-defendant moved to strike the entire jury panel, arguing juror 6's retaliation concern tainted the panel. Resp. Ex. 46 at 235. The trial court denied the request. Id. at 237.

The parties discussed cause challenges and peremptory strikes, ultimately accepting a potential jury of twelve individuals. Resp. Ex. 47 at 286-87. The parties then tried to seat two alternates with the trial court permitting each party two peremptory strikes for potential alternates. Id. at 287. At first all parties agreed that jurors 50 and 52 would sit as alternates, but when the state used two back strikes, juror 52 was moved from an alternate juror position to the twelve-person jury. Id. at 289-91. The parties used their remaining alternate strikes, resulting in only one potential juror remaining as an alternate. Id. at 293. The following exchange occurred:

> THE COURT: We're now in a position [where] we will not have two alternates. We only have one person left. I'll hear from you, Mr. Carlisle, as to juror number 56.
>
> MR. CARLISLE: Your Honor, it's my understanding number 52, Mr. Macaluso, is on the jury as the 12th member?
>
> THE COURT: Yes.

MR. CARLISLE: Your Honor, we are going to back strike number 52, Mr. Macaluso.

THE COURT: Juror 52 is excused pursuant to defendant Lai's ninth peremptory. That takes us to juror number 56.

MR. MOODY: Judge, I apologize, I would ask for a race neutral reason on number 52 . . . .

THE COURT: Okay. On 52 I'll hear from you, Mr. Carlisle.

MR. CARLISLE: Your Honor, he was a victim of an armed robbery.

MR. MOODY: Your Honor, so are most of the jurors that – most of the jurors that have been left on here have been victims of various crimes, so I would ask again for a race neutral reason that is different than other jurors they've already agreed to leave on other than the fact that he's a white male.

THE COURT: And for the record juror number 52, Anthony Macaluso, M-A-C-A-L-U-S-O is a white male. Is there anything further, Mr. Carlisle?

MR. CARLISLE: No, Your Honor. He's a victim of a robbery, an armed robbery with a firearm.

THE COURT: He said he was robbed at gunpoint 22 years ago in Jacksonville. Both people were caught. That's what I have in my notes about it.

MR. MOODY: Yes, ma'am. 22 years ago. Ms. Barr was a victim of a burglary. [ ] Mr. Landtroop which they agreed to had his car stolen. I mean I can go through – I've got others but I – just again I would ask for consistency. He's a white male and especially

> considering now we're at the point where the entire panel – we're out.
>
> THE COURT: Very well. At this time the Court finds that – while the explanation is facially race neutral that given all the circumstances surrounding the strike that the explanation is a pretext at this point in jury selection so the strike is not going to be sustained, so juror number 52 is back on the panel . So we again have a panel of 12, so we need to address juror number 56 as a potential alternate. . . .

Resp. Ex. 47 at 293; Resp. Ex. 48 at 295. Counsel for co-defendant then used his second and final alternate strike on juror 56, and thus the parties tried the case without an alternate. Resp. Ex. 48 at 297.

Right before the trial court swore in the jury, the trial court addressed Petitioner and co-defendant who both advised the trial court they agreed with the chosen jury panel and believed their attorneys struck every potential juror they wanted stricken. Resp. Ex. 48 at 298-99. Mr. Boyle, counsel for co-defendant then stated:

> MR. BOYLE: To be clear, Your Honor, we do not accept the panel. We're reserving our previous motion to strike the entire panel based on the comments to juror number 6 so we are not nor is Mr. Fiacre accepting the panel.
>
> MR. CARLISLE: Same for defendant Lai we are adopting that argument.

Id. at 299. The trial court acknowledged the renewed objection and proceeded to swear in the jury panel. Id.

Following trial, Petitioner's trial counsel moved for a new trial arguing, inter alia, that the trial court erred in sustaining the state's objection to Petitioner's peremptory strike of juror 52. Resp. Ex. 34 at 248. The trial court conducted a hearing on the motion, during which it heard argument from trial counsel and the state. Resp. Ex. 37 at 288-308; Resp. Ex. 38 at 309-24. Trial counsel explained that he used nine of his ten peremptory strikes and acknowledged that while eight of those peremptory strikes were used to strike white males and females, most of the individuals he struck were also victims of crimes, and thus there was no discriminatory purpose in attempting to use his tenth strike on juror 52. Resp. Ex. 37 at 295.

In response, the state detailed the makeup of the jury selected and explained that Petitioner did not move to strike several of the seated jurors despite also being crime victims. Id. at 299-305. The twelve-person seated jury was made up of these jurors – juror 2 (white female), juror 17 (white male), juror 22 (black female), juror 23 (white male), juror 24 (black female), juror 25 (Asian female), juror 27 (Hispanic male), juror 32 (black male), juror 37 (white male), juror 38 (white female), juror 46 (black female), and juror 52 (white male). Id. at 303-05. The state explained that juror 2 disclosed she was a victim of a burglary; juror 17 had his car stolen; juror 37 had his home burglarized four times; and juror 46's best friend was the victim of a robbery. Id. at 299-300. According to the state, however, Petitioner only moved to strike juror 52 based

on his history of being a crime victim. Id. The state also argued that when it struck juror 36, a black female who was a victim of a home invasion robbery, Petitioner objected and asked for a race-neutral reason for the strike to try to keep her on the jury. Id. at 300. A point which the state argued showed Petitioner's pretextual motivation in seeking to strike juror 52. Id. After considering the parties arguments, the trial court denied Petitioner's motion for new trial. Resp. Ex. 38 at 324.

Petitioner, with help from appellate counsel, then challenged on direct appeal the trial court's finding that his attempt to strike juror 52 was pretextual. Resp. Ex. 80 at 37-45. The state filed an answer brief arguing that this issue was not preserved for appellate review because trial counsel failed to renew his objection and request to strike juror 52 before the trial court swore in the jury panel. Resp. Ex. 81 at 24-25. The state also argued that even if the issue were properly preserved for appellate review, the claim lacked merit because trial counsel's request to strike juror 52 was pretextual. Id. at 26-31.

The First DCA affirmed Petitioner's judgment and sentence through a written opinion. Resp. Ex. 83. The First DCA's written opinion, however, did not discuss this claim. Id.

In their Response, Respondents first argue that Petitioner failed to properly preserve this issue for appeal because trial counsel failed to renew his objection before the jury was sworn in. See Resp. at 33-34. They also argue that

to the extent the issue was preserved for appellate review, the First DCA's adjudication is entitled to deference.

"Under Florida law, simply objecting to [a party's] possibly discriminatory strikes, and then countering any purportedly race-neutral explanation given by [ ], does not suffice to preserve a <u>Batson</u>[5] claim for appeal. Rather, trial counsel must press the already rejected challenge a second time at the conclusion of voir dire, either by expressly renewing the objection or by accepting the jury pursuant to a reservation of this claim." <u>Davis v. Sec'y for the Dep't of Corr.</u>, 341 F.3d 1310, 1315 (11th Cir. 2003) (citing <u>Joiner v. State</u>, 618 So. 2d 174, 176 (Fla. 1993); <u>see also</u> <u>Melbourne v. State</u>, 679 So. 2d 759, 765 (Fla. 1996)).

Also, "in the absence of any evidence to the contrary," when the state argues in its answer brief on direct appeal that a claim is both procedurally barred and should be denied on the merits, and the state appellate court does not clearly indicate that in affirming the judgment and sentence it reached the merits of that claim, the federal habeas court should presume that the state court's affirmance was based on the state's procedural default argument. <u>Bennett v. Fortner</u>, 863 F.2d 804, 807 (11th Cir. 1989).

Here, trial counsel failed to renew his objection to juror 52 before the jury was sworn, the state argued in its appellate brief that this issue was not

---

[5] <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

preserved for appellate review, and the trial court did not address this issue when it affirmed Petitioner's judgment and sentence. Thus, the Court may presume the First DCA found Petitioner did not properly preserve the issue for appeal and thus declined to consider the merits. To that end, assuming the First DCA's decision rested on a procedural default, the Court cannot now consider this claim on habeas review. And Petitioner fails to demonstrate that an exception applies to excuse the default.

On the other hand, the Eleventh Circuit has held that the <u>Bennett</u> presumption "only properly applies 'in the absence of <u>any evidence</u> to the contrary.'" <u>Moore v. Sec'y, Fla. Dep't of Corr.</u>, 762 F. App'x 610, 621-22 (11th Cir. 2019) (emphasis added).[6] And some courts have held that when a state appellate court's written opinion addresses one issue on appeal and otherwise makes a general vague statement about other appellate claims, that ambiguous statement suggests an appellate court may have gone beyond a procedural default argument and considered the merits of a claim raised on appeal. <u>See, e.g.</u>, <u>Rosenfeld v. Dunham</u>, 820 F.2d 52, 54 (2d Cir. 1987) (holding that when a state appellate court issues a written opinion, the district court cannot assume

---

[6] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. <u>See</u> <u>McNamara v. GEICO</u>, 30 F.4th 1055, 1060-61 (11th Cir. 2022); <u>see generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

the state appellate court rested on a procedural default argument, even if the written opinion does not discuss the claim at issue).

Here, there is some evidence that the First DCA may have considered this claim on the merits. First, the state made an alternative merits argument in its answer brief on direct appeal. And although the First DCA's written opinion did not discuss this claim, it made the following general statement in its written opinion: "We find no reversible error in the issues presented . . . ." <u>Lai</u>, 251 So. 3d at 334. Thus, the <u>Bennett</u> presumption that the First DCA's affirmance of this claim was solely based on a procedural default may not apply. That said, even if the Court cannot presume that this claim is procedurally defaulted, Petitioner is still not entitled to the relief he seeks because this claim is without merit.

The three-step procedure for evaluating an objection to a peremptory challenge is:

> (1) the objector must make a prima facie showing that the peremptory challenge is exercised on the basis of race; (2) the burden then shifts to the challenger to articulate a race-neutral explanation for striking the juror[] in question; and (3) the trial court must determine whether the objector has carried its burden of proving purposeful discrimination.

United State v. Allen-Brown, 243 F.3d 1293, 1297 (11th Cir. 2001) (citing Batson, 476 U.S. at 79).[7] "In deciding whether the proffered race-neutral reason for the peremptory strike is a pretext, the court should focus on the genuineness of the explanation, not the reasonableness." Truehill v. State, 211 So. 3d 930, 943 (Fla. 2017). In assessing genuineness, however, the court can consider reasonableness as well under other relevant circumstances, including "a strike based on a reason equally applicable to an unchallenged juror." Id. (quoting Poole v. State, 151 So.3d 402, 410 (Fla. 2014)); see also United States v. Hughes, 840 F.3d 1368, 1382 (11th Cir. 2016) ("Of course, a court may find intent to discriminate when the reason provided for striking a juror applies with equal force to a juror that the same party declined to strike, who is outside the protected group of the stricken juror."). Indeed, "[a] [ ] court's perception of an

---

[7] Although when briefing this issue in state court, Petitioner did not address Batson itself, he did refer to the elements of a Melbourne inquiry, which is Florida's equivalent of an inquiry under Batson. See Doc. 80 at 46; see also Carillo v. Sec'y, Fla. Dep't of Corr., 477 F. App'x 546, 549 n.3 (11th Cir. 2012). To that end, in his initial brief on direct appeal, Petitioner raised this claim in terms of state law only and did not reference an equal protection violation or any other federal constitutional right. See generally Resp. Ex. 80. In their alternative deference argument, Respondents again do not contend that Petitioner failed to exhaust the federal nature of this claim. Instead, they argue that to the extent the First DCA considered the merits of this claim, the Court should apply deference to the First DCA's adjudication as it "undertook the same analysis as that set forth in federal law," and its decision was not an unreasonable determination of the facts in light of the evidence before it. Resp. at 25-26. Considering the Response, and to the extent the Bennett presumption and resulting procedural bar do not apply, allowing the Court to apply deference to any First DCA adjudication, the Court finds that the federal nature of this claim was exhausted in state court.

attorney's credibility is an essential part of determining whether a proffered reason was pretextual." United States v. Walker, 490 F.3d 1282, 1293-94 (11th Cir. 2007). When considering a race-neutral explanation, "[c]redibility can be measured by, among other factors, the [attorney's] demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." Madison v. Comm'r, Alabama Dep't of Corr., 761 F.3d 1240, 1251 (11th Cir. 2014) (citation omitted).

Here, trial counsel offered a single race-neutral reason to strike juror 52 – he was a victim of an armed robbery. But after considering the totality of the circumstances surrounding the request to strike juror 52, the trial court found the request pretextual. Some of those circumstances included the following – trial counsel did not move to strike several other jurors who were victims of crimes; trial counsel objected to the state's peremptory strike of juror 36, an African-American who was the victim of a prior burglary; juror 52's burglary incident occurred twenty-two years before Petitioner's trial; juror 52 testified that his experience would not impact his consideration of the evidence; and juror 52 was one of the last potential jurors in the available jury pool. Thus, upon review of the record, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law,

and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The Court cannot find that Petitioner is entitled to federal habeas relief on this claim. Ground Three is due to be denied.

Accordingly, it is

**ORDERED AND ADJUDGED**:

1.     The Petition (Doc. 1) is **DENIED** and this case is **DISMISSED with prejudice**.

2.     The **Clerk of Court** shall enter judgment accordingly, terminate any pending motions, and close this case.

3.     If Petitioner appeals this Order, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[8]

---

[8] The Court should issue a certificate of appealability only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.

**DONE AND ORDERED** at Jacksonville, Florida, this 5th day of July, 2023.



TIMOTHY J. CORRIGAN
United States District Judge

Jax-7

C:    Francis Lai, #151007
        counsel of record